The next case we're going to hear is K & D Holdings v. Equitrans and Mr. Bagnall, Ms. Bagnall. Is that, how do you pronounce it? It's Bagnall, Your Honor. Bagnall? Bagnall, yes. Silent T? There's no T. Oh, my copy has a T in it, I'm sorry. We'll get it right. May it please the Court, Your Honors, my name is Nicole Bagnall and I am here on behalf of Equitrans, L.P. and EQT Production Company. You may note, Your Honors, that I am suffering from laryngitis today, so I will do my best to be clear and so that you can hear me. If you have any issues, my co-counsel, Mr. Abbott, is ready to step in, so please let me know if you would prefer, if you can't hear me, for him to do the speaking. Your Honors, this is a plain meaning case and the plain and unambiguous language of the lease could not be clearer. The lease states that it remains in full force and effect so long as gas is produced or stored or stored gas is protected. Because the meaning of the word or is clear and there's no dispute that the protection of gas has occurred throughout the life of the lease, this lease is not severable and it remains in effect. Your argument is the lease, as you define lease, gives you rights A, B, and C. Yes, Your Honor. And then the lease lasts for five years unless any one of those A, B, and C is ongoing. One or more. That's right, Your Honor. That's the beginning and the end of your argument, right? Pretty much. I'm going to keep going now if that's okay. As far as you're concerned, you read Article IV of the lease, it says what it says, and if you read the plain meaning of it, the district court judge's view of severability was something imported into the lease that's not included there. That's right. He simply read the lease wrong. And it's not only Article IV that talks about the duration of the lease, it's all of the provisions of the lease. It uses the term lease. It doesn't use the term one of the rights under the lease are extended. And so that if you have the right to drill or the right to store or the right to protect, any one of those rights you have under the lease. And the duration is for five years or if you have an ongoing operation. That's exactly right. It says the duration says to have and hold the said land and privileges for the said purposes for five years or so long as there's production or storage or the protection of storage. And if you look up at the purposes provision of the lease in Section 1, the purpose is for exploring and operating for and producing and saving oil and gas and for storing gas in the substrata and protecting the stored gas. That's not, that may be the purpose, but it's also the rights. It's the scope of the lease. Absolutely. In that same provision, Your Honor, it says that if your company said after they signed that lease, they told the lessor, we're going to protect stored gas. That's all we're going to do. We're not going to drill. And you kept going. It would just never end until as long as you're storing stored gas, protecting stored gas. As long as we're doing one of the three things that holds the lease, the lease is held in its entirety. That's exactly right. The lease also gives . . . We've had a number of cases from other states with similar lease provisions. Presumably, it's common throughout Appalachia, I'm thinking. And so the question occurred as to if this is going to be a recurring issue, is there any merit to having the West Virginia Supreme Court of Appeals determine it? Because whatever we would decide would not bind them. I don't know whether there are a hundred of these other cases that are going to come up in West Virginia or not, but I'm not saying that's meritorious. I'm just asking the question. I think there's no need for a certification to the West Virginia Supreme Court in this case, because the issue of law is severability. And there's no dispute as to what the law of severability is in West Virginia. The Quinn case that was relied on by the district court and both of the parties here is well-settled law on severability. The only question is the application of the facts, and that's clearly within the jurisdiction of the federal court. They just did it wrong here. And I think a good way to look at whether or not a question should be certified to the West Virginia court is what the question would be. In this case, I mean, you certify a question of law. You don't ask them to apply the law to the facts. They can't do that on a certified question. And so here the only questions would be what is the law of severability in West Virginia. That is clearly defined by West Virginia case law that comes from the West Virginia Supreme Court. So it's simply not necessary. In cases where this court has certified a question, there's been questions about the interpretation of a statute or the law isn't well-settled. There's been a dispute as to what the actual law of West Virginia is. That's not present here. So there's just simply no need. So I just would like to point a couple places. In addition to the payment provision which this court has noted, I mean, in addition to the duration provision which this court has noted, the payment provision is also critical in determining whether or not a contract is severable. And here the district court and K&D rely on the payment provisions. But they simply misread them. The payment provision provides that there will be a payment if a well is drilled and gas is produced of one-eighth or a payment if there's a storage well in the rentals provision, in the royalty provision. But there's also a rentals provision that says if there's no producing well or if there's no storage well, then a payment is also made for gas storage or the protection of storage. So those are inextricably intertwined. In order to tell what payment you receive, you have to know if there's production and you have to know if there's storage. You can't sever this contract into two completely separate contracts as the district court did because you have to look at these provisions and see what exactly is being done under the lease. And I also think it's critical for you to look at the carrying provision. The carrying provision is also called a delay rental in other leases. And that rental says that you receive this rental up until there's either a producing well or storage. And then if either of those occur, the carrying rental goes away. So, again, the provisions for payment are inextricably intertwined. Neither K&D nor the district court provide any evidence to the contrary of this plain reading. And as you mentioned, 16 other judges have applied substantively the same law as West Virginia in Pennsylvania and Ohio and looked at essentially the same provisions of the lease and found that they're not severable. And they're not binding on this court. I do think that it's very persuasive. They looked specifically in the Penico and Jacob's case at the same payment provisions and found that they were inextricably intertwined, that they were interrelated, and so they couldn't be severed. And in the Pennsylvania State Court, Judge Neilitz and Warren looked at the delay rental provision that was the same as the carrying rental in this case and, again, found just looking at that alone that the payments were inextricably intertwined. The district court erred in four ways in reading the lease and applying the well-settled law of West Virginia to the facts. The first was he said that there were two purposes to this lease, production and storage. And there are clearly, if you read the purpose provision, at least three, production, storage, and the protection of storage. And the lessee can choose to do one, two, or all three of those at its option. The court also said there was separate consideration. As I just explained to you, the consideration is intertwined. The district judge relied on the fact that there was no requirement to drill as evidence that these were two separate contracts that were simply put together in this lease. And, in fact, I believe that that's proof that the parties intended that this be one contract. They expressly said you didn't have to drill a well, you didn't have to have production in order to maintain the contract. And, finally, the district judge said that the fact that there was no production was evidence that the contract could be severed into two. And, again, this was an error because if you look at the Supreme Court's guidance in the Quinn case, they said that you must, and I think it's worth quoting, look at the intention of the parties, and such intention shall be ascertained from a consideration of the subject matter of the contract, here, production, storage, and the protection of storage. A reasonable construction of the terms thereof, again, here, you look at the purpose, you look at the term, you look at the payments. And the conduct of the parties during their negotiations, all of which should be viewed in the light of the surrounding circumstances. Is that any different than normal contract interpretation? No, Your Honor. It's the same as any other contract. We learn in law school, isn't it? Yes, that's exactly right. You read the contract for its content and try to reach the meaning of the contract conveys. Absolutely. And there's settled West Virginia law from the Supreme Court, as well, that says general contract law applies to oil and gas leases, like this one. So it doesn't matter what the parties are doing today in terms of an analysis of severability. The Quinn Court has said you look at the intent of the parties at the time they entered into the contract. The intent is clear from this contract. Every provision makes it clear. Plaintiffs never explain why this reading is not correct. They never offer an alternative meaning or even quote the relevant language in their brief. And they never argue even that the lease is ambiguous. Is there a copy of the lease in the JA that is readable? Have you typed a full copy? The references were to this type, this version. I can barely read. It's minuscule. I apologize, Your Honor. Is there a typed version in here? Did I miss it somewhere in the JA? There's not a reproduced copy of the entire lease in the joint appendix. The version at 260 is the original lease. However, all of the relevant provisions are retyped in full in the facts section of our appellant brief. I understand that, but I may disagree on what's relevant because sometimes I like to look through the context and see what the whole lease says. And I don't know if there's a way to provide us with a clear copy of that. Is this a reduced version? No, Your Honor. That's a copy of the lease as it's recorded. But I would be happy to reprint it for you and provide it to the court. I'll figure it out. I apologize that it's difficult to read, Your Honor. That's an issue with many of the appellation leases, as I'm sure you're aware, as more of these cases come before you. Well, they're old. People use much smaller print at that time. Just sign here. Your Honors, K&D raised other issues in their response brief that we believe are irrelevant, were not raised in the lower court, or are improper on appeal. I'll rely on my reply brief unless you have any other specific questions for me today. Thank you very much. Thank you. All right. Mr. Whitman. May it please the Court. My name is Stephen Whitman. I practice law in Clarksburg, West Virginia. I'm representing K&D Holdings against Equitrans or EQT production. I think we're going to drill another well. You want to drill a well. The thing that the district court did, which is sort of unique, is that it went one step further, and it said, what is reasonable protection for your storage? These leases were entered into in 1989. In 1994, West Virginia said, reasonable storage protection extends 2,000 feet beyond the storage pool, and that's it. It also coincides with what the FERC regulations were that came out, and these were stipulated. The FERC regulations say reasonable storage extends 2,000 feet beyond the storage pool. If you'll look at our plats, I don't know if these are as clear in these examples or not, but page 89, you will see a plat of what we're talking about. The Equitrans lease is below the K&D oil and gas. It extends approximately 25 acres. That's what is given in protection. What does that have to do, though, with the terms of the lease? I understand you want another business transaction now, but if the parties agreed to the terms of the lease, they still have an agreement all these years later. The court says that storage protection was never defined accurately in those leases. Storage protection is vague. It has not been defined by our courts. You will note that they cited several cases. Can I clarify just one thing on that point? My recollection was that the district court didn't address the issue because it didn't or it denied summary judgment on the issue of whether the entirety of the lease process was necessary for protection. Right. And it is requiring the drillers to give the protection that the law requires in FERC regulations and in statutory regulations. But how does that relate or how does that inform the determination of the or how does that inform the interpretation of the lease? Going back to your characterization that the district court did something unique in that respect. It did do something unique. It did call it a dual-purpose lease, and that's what they called it. There were two purposes in the lease, each of which would be enforced in their own rights. They would have access to the storage protection that is given to them because they have asked for storage protection. Storage protection has certain drill-through instructions, which cost a driller in the neighborhood of $100,000. We will follow those drill-through instructions whenever we drill. They're paying us $800 or $900 a year for storage protection. We will, in turn, spend $100,000 to protect the storage. And the question went back to the relevance of that to the interpretation of the obligate right, whether or not the requirements of the lease. Okay. I think the court was reading into it the difference between a Marcellus shale, which does not interfere with a protective zone because it's below the protective zone. Marcellus, these storage leases are in a seam that's about 2,000 feet deep. It's called the Kiener Strata here or the big engine sands. That's where they store the gas. And the protective zone is 2,000 feet. Do you dispute the fact that they are protecting stored gas right now on the 180 acres? On part of it, they are. Yeah. On part of it. Well, then doesn't that end it? No. No, it does not. The lease says they have exclusive possession of the 180 acres. Right. And they define the acreage for the purposes of A, B, and C. Right. And they are using that lease now to store, which is one of the rights. To protect storage. Protect storage. Protect storage. Right. And you've conceded they do it. Doesn't that end the matter? No, it does not. Tell me what's wrong with the lease. It's interpreted and the court directed EQT to come up with a reasonable interpretation. Tell me what's wrong. Where's the lease do what you want? We are wanting to give them reasonable protection for their storage. But they don't want it. They've got the leasehold, exclusive leasehold. And that's why they called it a dual-purpose lease is because they don't call it a dual-purpose lease. Our court did. Our court did. Judge Bailey did. I know. But let's stick with the lease. I'm asking you to tell me there's a leasehold here. Right. It's a real property interest. And it's an exclusive possession of 180 acres for the purposes of A, B, and C. One of the things is to protect stored gas. Yes. Or oil. And that's what they're doing. You've conceded that. Now, they don't have to use every square inch. They've got the exclusive use of 180 acres to find right here on the first page of the lease. I apologize. And tell me what's wrong with that. That's a traditional leasehold going back to jolly England, you know. Your Honor, the court, by interpreting it as a dual-purpose, looked at the purposes of the lease and gave them the protection that they were requiring. There's no definition of what this is. He can't interpret what they require. They have leased it. There are statutes that require the 2,000-foot barrier. They don't require the entire lease. I understand. You can maybe construe that, but that isn't what this lease did. No. Well, let's stay out of that, then. Okay. And the question is, where in this lease does it say they have to exercise all three rights to keep the leasehold? It does not say that in the lease. Your argument is that you ‑‑ I understand your argument to be that they don't need the full extent of the acreage to protect gas storage. Yes. But I don't see any hook that allows you to question their ability to use the entirety. If we're going by the intent of the parties, it just doesn't seem. You have a reason to question, under the provisions of Section 4, how much of the acreage they used to protect the storage. I cited a case that's sort of unique. And especially when it says the lessee shall be the sole judge. I cited a case. It's called the St. Luke's Church ‑‑ the Methodist Church case in my ‑‑ I'm sorry. I cited the St. Luke's Church case in my brief. St. Luke's Church case was an 850‑acre lease where there was one well drilled, but it was not maximized for production purposes. The court ruled in the St. Luke's Church case that the lessee could drill ‑‑ the lessor could drill a new well on that property so long as it protected the first well. What's that got to do with Article 4 of this lease? This basically ‑‑ It defines the duration of the lease under any of these conditions that are stated in the disjunctive. I don't get the connection. We drill on leases where oil and gas is produced but not to the maximum. We drill where oil and gas is being produced for free gas only. We have several laws in our state that allow us to drill where oil ‑‑ Are you arguing that laws overrule this contract? No, I'm just saying it helps us interpret the contract. Except the contract's clear. It's unambiguous. It provides exclusive possession to the lessee, exclusive possession of 180 acres for purposes of A, B, or C. Yes. And they have the right to do A, B, or C. And if they engage in any of those beyond the five years, they can continue as long as they're doing that. And it seems to me that's a contract. It is a contract. And you're not addressing the contract in your brief or in an argument. The court said that it was a dual purpose contract. Look, we're up here to construe it, right? Right. All right. We're reviewing the court. Four corners of the bar. They argue that the court is wrong, so now you need to go back to what we're supposed to look at, which is to determine whether the court was correct. And this case provides for a lease, and I respectfully submit it has at least three purposes defined in the lease, which is different from dual purpose. It has any one of them are rights that you can exercise under the lease, exclusive rights for 180 acres. And I don't understand how you get around that. The court said that the entire 180 acres was not needed for storage protection. You said it's needed. They rented it for this purpose. The purpose of storage protection wasn't defined when that lease was prepared in 1989 the way it is now. It's changed in time. Well, aren't they entitled to what they agreed to at the time? You can't change under the Constitution. You can't change contracts as you go along. We can interpret them, and that's how it was interpreted, Your Honor. How was it interpreted in 1989? I wasn't there in 1989, but in 1989 it was a person owned the surface and the oil and gas. So it was an oil and gas, and they had surface rights and they had oil and gas. So they had the storage rights, which go to the surface. The oil and gas leasing is separate from the oil and gas storage rights, and now we're looking at something called storage protection. All right. Well, your task is to point us to language in the lease that shows the district court's interpretation of the lease as to severability is correct. I don't think it makes any difference about these West Virginia statutes or what stratum underneath the earth the gas is at. You need to point us to language in the lease that shows plainly the district court was correct. Can you do that? The district court recited two cases, which are cited to allow for the dual purposes. We understand that severability is a possible doctrine in the state of West Virginia. You have to show us in the lease what supports the district court's determination. The court looked specifically at the entire lease and determined that the purpose of the lease was to provide for the exploration of oil and gas. It's defined as one of the purposes. The oars define and limit each one of those oars gives certain obligations, and the court broke it down into a dual purpose because of that, because of the oars. The court did look at two cases, the Quinn case and the Regent case, both of which allowed for dual-purpose leases, and you'll note that the parties entered into stipulations of fact, and that's what the court finally made its decision upon because the court looked at some type of a reasonable interpretation of the storage protection. But this doctrine doesn't seem to hold water because the oars are the possible conditions to extend the lease. The lease itself, what you're extending the lease is defined in Section 1, Article 1, which is an exclusive possession of 180 acres for any of three purposes. And then storage rights. And they don't have to use all three. Storage rights is not defined in that part of the lease. Storage rights were defined by statute. I thought you agreed with me that they are protections. There are protections for storage. Okay. And it extends to 2,000. That's what they agreed to, in a sense, in 1989. Is that the way you like to handle contracts in order to figure out what they need? I mean, if they bought a widget, they bought three widgets and they only needed one, we don't divide the contract up and say they didn't need the other two, do we? No. No, I apologize, Your Honor. But that's the way the court did it. Well, that doesn't give you support, does it? You're trying to argue that the court was right. The court was right because what the court was looking at was how do you interpret storage rights in a reasonable fashion? And that's what the court stated. It asked the parties to come up with reasonable rights to the storage, and that's how we got the 2,000-foot barrier, which we agreed to abide by, and they agreed to abide by. In 1989? No, we agreed in court. That's why there were stipulations of fact about the 2,000-foot barrier. I'm asking you to not tell me what the court did or what you argued. I want you to tell me why the court was right, relying on what the court would look at, and the court looked only at this lease, right? It looked at the separate considerations that are involved, and that's why they severed it. That was part of the rulings that the court made. Now you tell me why the court was right. If the consideration is single. I don't want to know what they did. I want you to tell me why it was right. Because the court decided to divide the lease and to give everyone what they had bargained for. Look, I understand what the court said. Right. I want to know was that the right thing to do? Under this lease? It benefits all parties because no party is hurt. And we are hurt by not developing this oil and gas. We are hurt financially from not developing the oil and gas. They are protected. You're hurt because you don't have this lease, and somebody else does. They're not developing it either. So what? They're paying the rent that it provides for. Every year they pay their rent. For storage. Well, that's the rate for that. It depends on what they do. Right. They aren't paying to develop it, and they're not developing it. And it doesn't say they have to develop it. No, but they don't want to develop it. And they don't have to. I don't understand where you're getting all these ideas that reconstrue the intent of the parties. The court looked at the lease and separated it, and that's where the problem seems to be is the severability of the lease, making it a separate lease. One for development of oil and gas, one for storage. Both are being protected. Storage protection is what seems to be the issue that blocked development. And the court directed that we provide. Who said development's in charge? They could have entered into a lease and said, we're going to grow sunflowers. No, they entered it. I mean, the idea that you have to judge whether their lease is reasonable or not, whether they got what they wanted, whether they're getting protection. What they got is what they agreed to get. And what was given is what they agreed to give. And you keep wanting to change that. And you do it by saying what the district court did instead of pointing out in the lease why you think that that's a reasonable way to read a lease. Well, what I'm saying about the lease is that it has provision in there for storage and for storage protection. Cases that were cited from Ohio and Pennsylvania are all dealing with storage, not storage protection. The last case that they cited dealt with a storage protection issue. I think that was a sign. The problem, though, is that you've agreed that they have the right to protect storage. They have the right. And we have a right to define how to protect the storage, 2,000 feet. That's by law. Do you have the right to determine what the lease says? The law has determined that it's 2,000 feet. Except the lease says they have 180 acres to do that. Okay. Okay. The protective zone was what we're dealing with. We're not going to interfere with the protective zone. We'll provide the protection that needs to protect the storage. That's an extra cost that we have when we're drilling in a protective zone. But we are saying that we have that right because of the terms of the lease and by the court reviewing this as a dual-purpose lease. Why don't you go to them and buy the lease? Well, we try to negotiate, Your Honor. They wouldn't sell it? No. And they do drill through storage fields. There are, as the court noted, there are several examples where you drill through a storage field. And all you have to do is follow these. Maybe your price wasn't high enough. We try to negotiate. We list what our price would be. But, you know, they drill through storage fields, they do the protection, and it usually works out. And storage does not interfere with storage to drill a well 2,000 feet below the protective zone. Is that relevant? Back in 1989, there was no horizontal drilling. Now there is. That's what makes this a lot different. So you don't know what was intended in 1989 because there was no horizontal drilling. Now you can drill below a storage field, not interfere with it. The storage is protected. And we're looking at that possibility. The leases, the court found that the leases for the protection of storage would remain in effect. They were not voided. The entity of the property under the leases is not necessary for gas storage protection. They did not need all of that property. Now, the court also found that you really don't need to tell us what the district court did. You're trying to justify what the district court did. Yes, I am. So every argument you make ought to be made without relying on the district court for your authority. That's the object of our review. And it seems to me that every argument you're supporting about what the district court did . . . I'm sorry, Your Honor. No, it doesn't advance your argument. I'm sorry. You don't need to apologize. I just want you to go beyond what the district court did and say why the district court was right or wrong. I think what the district court was doing was trying to look at the parties and put them in what they call a balancing test. He was trying to make sense out of what is something of an anachronism in property law. Yes. We're trying to . . . The problem is that the language of the lease . . . It isn't clear that the language of the lease gave him the latitude that he took in trying to create reasonable expectations between the parties. I think what you're looking at is what we call the balancing test. You know, we're trying to look at the interest of an oil and gas developer, as well as an oil and gas company. And all of the oil and gas leases that we apply, and I think I've cited those in my brief, have the balancing test, where you look at these leases and try to balance the interest so that no one is hurt. The storage is being protected. It's not being interfered with. And whether that can block the development of an oil and gas lease was a question that the court had to look at. And they looked at it in a favorable decision for the development of the oil and gas. You know, everyone has a right to develop their resources, and that's basically what we're asking to do. If a court gave you the right to drill in an area which would not affect their storage, then the court would be interfering with the lease, wouldn't it, which is exclusive possession of 180 acres for drilling. Yes, it would. Contracts are often interpreted, and our statutes have often interpreted contracts in a way that is different. In West Virginia, many people had a $300 per year lease on their oil and gas. Our court has come along with the idea that everyone's entitled to an eighth royalty. We're not entitled to just $300 a year. Statute changed those leases. Statutes changed this lease because now their protective zone is limited to 2,000 feet. It can't extend over the entire property. It's only limited by statute to 2,000 feet. So these statutes have an effect upon those leases. All right, let me ask you this. If the statute took away some of the rights that were granted by the lease, lease is 1889, statute comes after that, and purportedly takes away some of the rights granted by the lease, would we enforce the statute in that case? You'd have to enforce the statute. It would affect the terms of those leases. What would the protection of contract rights under the Constitution mean? Remember the Dartmouth College case? Yes, I'm sorry, Your Honor. I would point out that protection of storage in 1989 was not what it is today. Drilling in 1989 is not the same as drilling today, and we are protecting the storage as we agreed that we would protect the storage. We're just wanting the right to develop it, and that was the reason the court ruled as a dual-purpose lease. It's the reason that it was decided in the district court as a dual-purpose lease, is because of the benefits that it gives to all parties, that it balances all interests and no one is hurt. They could show no harm by us drilling on all but the protective zone. Except it violates their leasehold. That's the only exception, yes, Your Honor. Okay, thank you. Excuse me. Why shouldn't the storage, protection of storage, be construed in accordance with the statutory definition subsequently adopted? There are many reasons, Your Honor. The first is that the statutes don't apply. This is a FERC-certificated, a federally regulated storage field, and he's referring to state statutes. The storage protection was affirmed in the lower court and not appealed by K&D, so it's not an issue in this case, and quite frankly, it's a red herring. We have the storage protection rights. That's not an issue. We're protecting storage, and the issue, and he says allowing the protection of storage. Why don't you let them drill in an unaffected area and get a lot more money? Because we own the right to produce, Your Honor. EQT's predecessor bargained for three purposes, the right to produce, the right to store. I was asking an economic question. Because we also want to. I thought they were just wanting to pay this high-powered litigation team and come up here and defend the lease. They could sell the lease for a lot of money these days. These guys are really hot to trot. They could if they wanted to, but one of the things that EQT has said in their briefs and isn't of record is the fact that they want to produce the guys on this lease, one of the benefits that they bargained for when they entered into it. His statement that EQT has no— Maybe they'll want to give you more money and bring that to a close. Maybe they will. Thank you, Your Honors. Thank you. We'll adjourn court for the day.
judges: Paul V. Niemeyer, Allyson K. Duncan, G. Steven Agee